[Civ. No. 13669.   First Dist., Div. One.   Mar. 3, 1948.]

MARY ELEANOR WILLSON, Petitioner, v. THE SU-
PERIOR COURT OF ALAMEDA COUNTY et al.,
Respondents.

Max Bamberger for Petitioner.

J. F. Coakley, District Attorney, Herman W. Mintz and
J. A. Gunning for Respondents.

BRAY, J.—The chronology of events in this matter is as
follows:

*August 18, 1942*—Phyllis Wilson was granted by default
an interlocutory decree of divorce against Del Willson, in the
Superior Court of Alameda County.

*October 30, 1942*—Interlocutory decree of divorce entered.

*August 21, 1943*—Three days after one year had expired
from the actual granting of the interlocutory decree, but over
two months less than one year from its actual entry, Del
Willson married Mary Eleanor Willson (the petitioner here-
in).   Apparently both Del and Mary in good faith believed
that the divorce had become final and Del was free to marry.

*November 8, 1943*—Final decree of divorce entered.

*March 3, 1945*—Del Willson was killed at Iwo Jima, leav-
ing a national service life insurance policy of $10,000, in
which Mary was named as beneficiary.   Under the rules gov-
erning veterans' insurance, Mary cannot collect on this policy
unless she was the legal wife of Del, and the government

has held up its payment to give her an opportunity of establishing the validity of her marriage. After the petition for the writ of mandate was filed in this court, it was learned that Del left surviving him, as issue of his first marriage, a minor child named Donald Del Willson. An order was made requiring service of the petition and writ upon him, and he has appeared through his guardian *ad litem*, Phyllis Willson. Phyllis Wilson, the former wife, admittedly has no claim on the insurance policy, as unquestionably her divorce from Del is a valid one.

*August 27, 1947*—Mary petitioned the Superior Court of Alameda County to enter an interlocutory decree of divorce *nunc pro tunc* as of the day of granting same, August 18, 1942, and a final decree as of one year thereafter, August 19, 1943. Were this done, it would validate her marriage to Del two days later, August 21, 1943, and would establish her right to collect the insurance.

■ The judge of the superior court before whom the petition was heard refused to enter the interlocutory decree on the sole ground that the court had no power to enter such decree where one had already been entered. It must be emphasized here that if such power exists, whether the court will permit the entry *nunc pro tunc* is in the sole discretion of the court. In this case, the court did not exercise its discretion, but denied the petition solely upon the ground of the court's lack of power. Hence, this presents to this court the single question whether the superior court has the power, under section 131.5 of the Civil Code, to enter an interlocutory decree of divorce *nunc pro tunc* as of the date it was granted, where an interlocutory decree is already of record.

There is a little confusion in the record as to whether the judge refused to enter *nunc pro tunc* the proposed final decree. Apparently he refused to enter the final decree *nunc pro tunc* as of the requested date, August 19, 1943, a year after the actual granting of the interlocutory decree, upon the ground that as he could not enter an interlocutory decree ahead of the one on file, he could not enter a final decree until a year had elapsed from the actual date of entry of the interlocutory decree. He probably did not refuse to enter the final decree *nunc pro tunc* as of October 31, 1943, which would be one year after the actual entry of the interlocutory decree. However, such an entry would be of no value to petitioner, as her marriage took place on August 21, 1943.

The history of divorce decrees *nunc pro tunc* in California is interesting. Prior to 1903, there was no provision in our statutes for an interlocutory decree of divorce. In that year sections 131 and 132 were added to the Civil Code. Section 131 provided for the interlocutory decree. Section 132 provided for the final decree to be entered when a year had expired after the entry of the interlocutory decree. Subsequently it was held that the mere lapse of one year after the entry of the interlocutory decree did not finally dissolve the marriage but that it required also the entry of a final decree. (*Estate of Dargie,* 162 Cal. 51 [121 P. 320].)

In *Grannis* v. *Superior Court,* 146 Cal. 245 [79 P. 891, 106 Am.St.Rep. 23], the court reviews the circumstances leading up to the enactment of sections 131 and 132 as follows: ''It has also been found that in some cases difficult complications occur, arising from divorced persons contracting a subsequent marriage before the judgment of divorce became final by the expiration of the time within which an appeal could be taken. To prevent or mitigate these evils it has always been the legislative policy to make many restrictions in the procedure in divorce cases which are not applicable in ordinary actions.

''In continuation of this policy the legislature in 1897 amended section 61 of the Civil Code so as to provide that a marriage contracted by a divorced person during the life of the former spouse, and within one year after the time of the judgment in divorce, should be illegal and void. (Stats. 1897, p. 34.) Immediately it was contended that this law was of no effect beyond the confines of the state, and that marriages solemnized during the year after the divorce within another state or territory, which were valid by the laws of such state or territory, must be recognized as valid in this state. Numerous attempts thus to evade the law were made, and much difference of opinion existed as to the legality of such marriages, until finally, in August, 1902, it was decided by this court that such marriages were valid in this state, and the question was thus settled. (*Estate of Wood,* 137 Cal. 130 [69 P. 900].) Thereupon the act of 1897 became practically a dead letter. All who wished to enter into another marriage within the year easily accomplished their purpose and evaded the law by a short journey beyond the borders of the state.'' (Pp. 248-9.) It then goes on to state that at the next session (1903) the Legislature again amended

section 61 by providing that no marriage of either party would be valid if contracted within one year after the entry of the interlocutory decree of divorce, and also enacted sections 131 and 132. After pointing out that these sections require the expiration of a year after the *entry* of the interlocutory decree of divorce before a final decree can be granted the court says (p. 252): "These provisions, interpreted in the light of the previous legislation and decisions and the purpose to be accomplished by the law, are clearly to be understood as a limitation on the power of the court in the matter, and as intended to forbid the entry of a final judgment until after the prescribed period."

The first time the question of using a *nunc pro tunc* decree in a divorce case was raised was in *Claudius* v. *Melvin,* 146 Cal. 257 [79 P. 897]. There the court held that "the year which must elapse before final judgment can be given begins to run from the time of the actual entry of the interlocutory judgment, and not from any theoretical *nunc pro tunc* date of entry." (P. 259.) In *Harris* v. *Superior Court,* 10 Cal.App.2d 586 [52 P.2d 605], and in *Nolte* v. *Nolte,* 29 Cal.App. 126 [154 P. 873], the court flatly held that no power existed in the court to enter an interlocutory decree as of a prior date. Along the same lines, it was held in *Corbett* v. *Corbett,* 113 Cal.App. 595 [298 P. 819], that the court had no power to enter a final decree of divorce *nunc pro tunc* as of a prior date, so as to validate a marriage occurring over one year subsequent to the entry of the interlocutory decree, but prior to the actual entry of the final decree.

In 1935, section 133 was added. This section provided that whenever either of the parties to a divorce action is, under the law, entitled to a final judgment, but by mistake, negligence or inadvertence the same has not been signed, filed or entered, and no appeal or motion for new trial is pending, the court, on the motion of either party, or its own motion, could cause a final judgment to be entered *nunc pro tunc* as of the date when the same could have been given or made if applied for, thus validating a marriage taking place subsequent to one year from the entry of the interlocutory decree and before the actual entry of the final decree.

Following the enactment of this section the question arose as to whether a final decree could be entered *nunc pro tunc* thereunder where a final decree was already of record. In *De Freece* v. *Industrial Acc. Com.,* 26 Cal.App.2d 584 [80

P.2d 129], decided in 1938, the petitioner was granted and had entered an interlocutory decree of divorce on May 6, 1927. Through inadvertence and possibly because of the death of her attorney, the final decree was not entered until January 25, 1935. In 1928, more than one year after the entry of the interlocutory decree, petitioner had entered into a common-law marriage in another state. The husband of this marriage died January 20, 1935. In attempting to collect compensation for his death, petitioner was faced with the illegality of her second marriage. More than two years after the final decree was entered, in an endeavor to validate the marriage, ''acting under the authority of a new code section (Civ. Code, sec. 133), which became effective approximately eight months after the date on which her final decree was entered, she obtained an amended final decree purporting to restore her to the status of a single person as of May 8, 1928 . . .'' (P. 587.) The appellate court held such a decree was a nonentity, because the section at that time provided that a *nunc pro tunc* final decree could be obtained only when a final decree had not been signed, filed, or entered.

Up to this time there was no statutory provision for the granting of a *nunc pro tunc* interlocutory decree. In 1939, the Legislature enacted section 131.5. This section made practically the same provisions concerning the entry of an interlocutory decree *nunc pro tunc* as were contained in section 133 concerning the entry of a *nunc pro tunc* final decree. Other than for an amendment in 1945, allowing the court to act on its own motion, it stands today the same as when first enacted. It uses the language upon which the decision in the De Freece case relied when holding that a *nunc pro tunc* final decree could not be entered where a final decree had already been entered. ''In cases in which the court has determined that a divorce ought to be granted, but by mistake, negligence or inadvertence, *the interlocutory judgment has not been signed, filed or entered,*'' the court may cause an interlocutory decree to be entered *nunc pro tunc* as of the day upon which the decree was actually granted. (Emphasis added.)

Apparently because of the De Freece decision, the Legislature in 1941 amended section 133 by adding, ''The court may cause such final judgment to be signed, dated, filed and entered nunc pro tunc as aforesaid, even though a final judgment may have been previously entered where by mis-

take, negligence or inadvertence the same has not been signed, filed or entered as soon as it could have been entered under the law if applied for.'' However, it is significant that the Legislature did not make a similar change in section 131.5, either when making the above amendment or later in 1945, when it amended section 131.5 to permit the court to act of its own motion. As the latter section now reads, and applying the reasoning in the De Freece case, an interlocutory decree of divorce *nunc pro tunc* can only be entered where by mistake, etc., one has not already been signed, filed or entered.

It is contended that sections 131.5, 132 and 133 should be read together, and that by so doing, in view of the 1941 amendment to section 133 (providing that another final decree may be entered even though one is already of record) this court can hold that the Legislature intended to provide that an interlocutory decree could likewise be entered even though there be one already filed. For us to so hold would be judicial legislation. In view of the De Freece case expressly construing a section (133 as it then existed) which contained identical language with section 131.5 as it now stands, we cannot say that the Legislature did not have in mind that where an interlocutory decree has already been entered, the time for appeal, and even for a motion, in default cases under section 473, has been started running, and the Legislature did not wish to provide a procedure which by an entry *nunc pro tunc* could possibly bar all right to appeal from the default interlocutory decree or to move under section 473 in regard thereto. Section 131.5 provides that in contested cases a showing must be made that there is to be no appeal or motion for a new trial. Of course, the rather absurd situation remains that if no interlocutory decree has been entered in a default case, the court may by a *nunc pro tunc* entry of both interlocutory and final decrees wipe out the right to appeal from or move as to the interlocutory decree, while if an interlocutory decree has actually been entered, even though late, such rights are not barred. However, that is a matter for the Legislature to consider and not the courts. Particularly is this so in view of the fact that section 61 of the Civil Code still provides: ''In no case can a marriage of either of the parties during the life of the other, be valid in this state, if contracted within one year after the entry of an interlocutory decree in a proceeding for divorce.'' It is possible that the Legislature, for reasons of its own, still

wanted a full year to elapse before either party could marry once an interlocutory decree had actually been entered, even though it permitted the year to run from the date of granting the decree, where no interlocutory decree has been entered and a *nunc pro tunc* one is obtained. It truly leaves an anomalous situation which only the Legislature can change.

*Estate of Hughes,* 80 Cal.App.2d 550 [182 P.2d 253], relied upon by petitioner, does not meet the situation here. In that case the point involved was whether a *nunc pro tunc final* decree of divorce to validate a marriage entered into after one year from the entry of the interlocutory decree and prior to the entry of a final decree, could be obtained after the death of one of the parties. In holding that it could, the court was proceeding under sections 133 and 132, and not under section 131.5, the section involved here. It held that sections 133 and 132 should be considered together, but if the case be authority for the proposition that sections 131.5, 132 and 133 must be considered together, we are still faced with the situation that section 131.5, the section dealing with interlocutory decrees, only permits a *nunc pro tunc* entry where there is not already an interlocutory decree on file.

*Ringel* v. *Superior Court of Alameda County,* 54 Cal.App. 2d 34 [128 P.2d 558], likewise is not in point, as it holds merely that where no final decree has been entered, one may be entered *nunc pro tunc* as of one year after the entry of the interlocutory decree. This case holds that the right to a final decree is statutory. The same would be true of the interlocutory decree, and, as said in the extract from the Grannis case hereinbefore quoted, sections 131 and 132 are limitations on the power of the court. Sections 131.5 and 133 constitute exceptions to such limitations, and hence, where the Legislature continued section 131.5 with the provision that it applied only where there was no interlocutory decree on file, the original limitation still applies in a situation where there is an interlocutory decree already on file.

We do not deem it necessary to consider respondents' contention that the second wife is not one of the parties referred to in section 131.5 who may move the court to permit the entry of an interlocutory decree, for the reason that the section now provides that in a proper case, the court may of its own motion order such entry. We prefer to treat the case as if it were one in which the trial court has been requested to make such order of its own motion, and has declined to do so

solely because of doubt of its power. It is significant, however, that in *Estate of Hughes, supra* (80 Cal.App.2d 550), although the question was apparently not raised, the court upheld the entry of a *nunc pro tunc* final decree, on application of the second wife, whose marriage was thereby validated.

Also it is unnecessary for us to consider the contention that the court should not permit the validation of the second marriage by the entry of *nunc pro tunc* decrees, in view of the claim of the child to the proceeds of the insurance policy. In *Macedo* v. *Macedo,* 29 Cal.App.2d 387 [84 P.2d 552], where the court permitted the entry of a final decree *nunc pro tunc,* the court, referring to section 133 as it stood in 1936, stated: "The act is both curative and remedial, and the retroactive operation of such statute should be given effect unless it disturbs some vested right or impairs the obligation of some contract."

Section 133 contains this language: "Upon the filing of such final judgment" (that is, a final judgment *nunc pro tunc* procured under its provisions) ". . . any marriage of either of such parties subsequent to one year after the granting of the interlocutory judgment as shown by the minutes of the court, and after the final judgment could have been entered under the law if applied for, shall be valid for all purposes as of the date affixed to such final judgment, upon the filing thereof." Any marriage subsequent to one year after the granting of the interlocutory judgment as shown by the minutes, to be valid under this section, depends, first, upon the filing of the *nunc pro tunc* final judgment, and secondly, upon the marriage occurring "after the final judgment could have been entered under the law if applied for." Therefore, if no final judgment can be filed because the year required by section 132 from the entry of the interlocutory decree of divorce has not expired, then the portion of the section reading "subsequent to one year after the granting of the interlocutory judgment as shown by the minutes of the court" does not apply. The very same language was in the section before its last amendment, and at the time the De Freece case held that a final decree *nunc pro tunc* could not be granted where a final decree was already of record. Hence, it follows that the "minutes of the court" language is applicable only after a proper final decree *nunc pro tunc* is obtained, which, of course, can only be after one year from the entry of the interlocutory decree.

As the Legislature did not change the provisions of section 131.5 and did not make any other provision concerning interlocutory decrees of divorce, there is no power given the courts to enter an interlocutory decree *nunc pro tunc* where one is already on file.

The petition for a writ of mandate is denied, and the alternative writ is discharged.

Peters, P. J., and Ward, J., concurred.